IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| PERDUE PREMIUM MEAT COMPANY, INC., D/B/A NIMAN RANCH <br><br> Plaintiff, <br><br> v. <br><br> MISSOURI PRIME BEEF PACKERS, LLC, <br><br> and <br><br> NEXTGEN CATTLE COMPANY, LLC, <br><br> Defendants. | Case No. 6:22-CV-03009-MDH |

## ORDER

Before the Court is Plaintiff Perdue Premium Meat Company, Inc., d/b/a Niman Ranch's ("Niman Ranch") motion for temporary restraining order and preliminary injunction. (Doc. 9). Plaintiff seeks to enjoin Defendants Missouri Prime Beef Packers, LLC ("Missouri Prime") and NextGen Cattle Company, LLC ("NextGen). On January 19, 2022, the Court held a hearing regarding the pending motion. The matter is ripe for review. For the reasons set forth herein, Plaintiff's Motion is **GRANTED.**

## BACKGROUND

Niman Ranch operates an Angus grass-fed program and is the largest farmer and rancher network in North America to be Certified Humane. All Niman Ranch livestock are raised according to strict protocols. Niman Ranch's grass-fed customer base includes 22 food service distributors across the country and three retail specific distributors who, in turn, distribute to numerous restaurants and retail outlets across the country.

1

On February 2, 2021, Niman Ranch executed a contract with Missouri Prime for the processing and fabrication of Niman Ranch's cattle into wholesale cuts and ground beef products (the "Agreement"). (Ex. 1) The Agreement expires on January 31, 2024. Either party may terminate the Agreement early, but the terminating party must provide at least 90 days' written notice to the other. *Id.* Notice of termination must be "sent by overnight courier service (such as FedEx) or by prepaid registered or certified mail, return receipt requested, addressed to the other party." *Id.*

The original document (Doc. 9, Ex. A) requires Missouri Prime to process the number of cattle stated in Appendix A of the document. Appendix A of that document, however, in incomplete and does not contain a number. According to Plaintiff, while the parties intended to sign the Agreement in February 2021, Missouri Prime was not in a position to begin processing cattle at that time. In April, when it appeared that Missouri Prime was prepared to process cattle, Niman Ranch sent Missouri Prime the committed headcounts constituting Appendix A to the Agreement. (Doc. 19, Ex. 1). However, Missouri Prime was still not in a position to begin processing cattle.

In May, Missouri Prime indicated that it was able to begin processing cattle and asked Niman Ranch to revise the committed headcounts schedule for May through September. Niman Ranch revised the schedule per the request. (Doc. 19, Ex. 2). The Agreement was executed in May and forwarded to Missouri Prime with the revised schedule for May through September. After receiving the signed Agreement and Exhibits 1 and 2, Stacy Davies of Missouri Prime countersigned[1] the Agreement and returned a copy to Niman Ranch.

---

[1] John Tarpoff, II, Vice-President of Beef at Niman Ranch testifies to this, but no document before the Court shows Davies' signature attached to any of the committed headcounts documents. (Ex. 1, 2)

Both committed headcounts schedules reflect a minimum of 40 grassfed cattle per week and included Niman Ranch's growth plan for later months in the year (growing from 40 to 80 grassfed cattle per week for certain weeks). At the request of Missouri Prime, the committed headcounts schedule was revised for September through December. (Doc. 19, Ex. 3). Missouri Prime consistently met the headcounts reflected in Exhibits 1-3 and acted in accordance with the entire Agreement at issue until the December 14, 2021 email.

On December 14, 2021, Matt Badsky, Missouri Prime's Chief Financial Officer, emailed Niman Ranch stating, "[w]e have made the decision to stop tolling for Niman at the plant, effective 1/3/22. We apologize for the news but we have no choice if we want to remain solvent." (Ex. 1). Missouri Prime did not send any notice via overnight courier or registered or certified mail as described the Agreement. Niman Ranch responded, asking Missouri Prime to honor the terms of the Agreement and provide the requisite 90 days before termination. Missouri Prime refused, stating "[w]e will provide you our defenses, through our counsel, at the appropriate time if you should decide to proceed in an action against the company." (Ex. 2).

On December 28, 2021, Niman Ranch sent an email to Missouri Prime confirming that Niman Ranch would be sending 40 head of cattle the following week for harvesting and production. (Ex.3). In response, Missouri Prime stated, "[w]e will not be receiving anymore [N]iman cattle until approval through NextGen." *Id.* NextGen Cattle Company is not a party to the Agreement. Niman Ranch accommodated Missouri Prime's request not to process cattle from Niman the week of December 27, so long as they processed 80 head on January 3, 2022.

Niman Ranch argues that as a result of the alleged breach, Niman Ranch cattle allocated to Missouri Prime will not be processed into finished meat products unless and until Niman Ranch can reposition another processor. It further argues that, failing 90 days' notice, Niman Ranch will

3

be without the time necessary to source, audit, and set-up a replacement processor because many steps in the process, beyond merely finding an acceptable alternative processor, cannot be accelerated because compliance with the USDA labeling approval process and the Certified Humane certification process requires much more time than three weeks. "Without a processor to harvest, cut, trim, and package these cattle, Niman Ranch will be unable provide finished meat products to its customers." (Doc. 10 at 4).

Niman Ranch states that Missouri Primes' refusal to process Niman Ranch's cattle while Niman Ranch locates a new processor during the 90-day period, will "permanently damage Niman Ranch's hard-won reputation for meeting its customers' needs...Niman Ranch convinced customers to take its new grass-fed beef product to replace those customers' existing grass-fed products, so if Niman cannot deliver its products to these customers, they will replace Niman's products and may do so permanently." *Id*. at 5. Furthermore, Niman argues that the delay in processing will harm its ranchers, because Niman will not be able to take its ranchers' cattle, at cost to the rancher. If the cattle remain unprocessed for too long, it cannot be used for grassfed programs and ranchers may switch to grain-fed programs. Accordingly, Niman is at risk of losing some of its suppliers as well as customers.

## STANDARD

Courts in the Eighth Circuit consider four factors when deciding whether to grant a preliminary injunction: (1) the movant's probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance of movant's harm and the injury an injunction could inflict on other parties; and (4) the public interest. *Heartland Academy Community Church v. Waddle*, 335 F.3d 684 (8th Cir. 2003) (citing *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981))*; see also Associated Producers Co. v. City of Independence, Mo.*, 648

F. Supp. 1255 (W.D. Mo. 1986). These same factors apply to the determination of whether to grant a temporary restraining order. *GP3 II, LLC v. Bank of the West*, 467 F. Supp. 3d 765, 769 (W.D. Mo. 2020).

## DISCUSSION

**1. Niman Ranch is likely to succeed on the merits**

"Since *Dataphase*, the Eighth Circuit has generally held that the likelihood of success on the merits is the most significant factor." *Champion Salt, LLC v. arthofer*, No. 4:21-cv-00755-JAR, 2021 WL 4059727, at *6 (E.D. Mo. Sept. 7, 2021) (citing *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013)). The Eighth Circuit rejects the requirement that a party seeking preliminary relief must prove a greater than fifty percent likelihood that he will prevail on the merits. *Dataphase*, 640 F.2d at 113. Instead, the question is whether the movant has a "fair chance of prevailing" on its claims. *D.M. by Bao Xiong v. Minnesota State High School League*, 917 F.3d 994, 999-1000 (8th Cir. 2019).

Niman Ranch has at least a fair chance of prevailing. Section 1 of the Agreement requires Missouri Prime to provide "90 days prior written notice of termination" before it can terminate the Agreement. Missouri Prime notified Niman Ranch via email on December 14, 2021, that it would stop performing on January 3, 2022. This is less than three weeks' notice—far less than 90 days. Furthermore, the notice was not issued in accordance with the Notice requirements in Paragraph 18 of the Agreement.

Defendants' only argument is that the Agreement is not valid because the contract provided by Niman Ranch in its briefing is incomplete. Specifically, Defendants argue that, pursuant to Paragraph 2.a of the document, Missouri Prime was obligated to process the number of cattle stated in the Appendix A of the document. However, the Appendix A is incomplete and does not contain

5

a single number. Defendants therefore argue that a material term of the document is missing, and the document is unenforceable. *Soybean Merchandising Council v. Agborn Genetics, LLC*., 534 SW.3d 822 (Mo. App. W.D. 2017); *Fedynich v. Massod,* 342 SW3d 887 (Mo. App. W.D. 2011).

In return, Niman Ranch provided the Declaration of John Tarpoff, II, the Vice-President of Beef at Niman Ranch. (Doc. 19). As detailed above, Tarpoff testifies that the original copy of the Agreement (signed February 2, 2021), with the incomplete Appendix A, was due to the fact that Missouri Prime was not in a position to begin processing cattle until May 2021. *Id*. Tarpoff testified that the Agreement was twice revised for the purpose of revising the schedule and number of cattle, and that Stacy Davies of Missouri Prime countersigned the Agreement with those changes— including the material term Defendants claim is missing from the Agreement. Those schedules and headcounts related to the Agreement were provided. (Doc. 19 at 5, 7, and 9). Missouri Prime offered no contrary evidence. The Court finds that Missouri Prime terminated the Agreement because it found more lucrative business opportunities, despite its ongoing responsibilities under its Agreement with Niman Ranch. Moreover, the Court finds that Missouri Prime agreed and followed the requirements and schedules of the Agreement until its December 14, 2021, termination email. The Court concludes that Niman Ranch has a fair chance at prevailing on the merits of its breach of contract claim.

2. **Niman Ranch is threatened with irreparable harm**

To demonstrate a sufficient threat of irreparable harm, the moving party must show that there is no adequate remedy ay law, generally because the movant's injuries cannot be fully compensated through an award of damages. *Ronnoco Coffee, LLC v. Castagna*, 2021 WL 842599, at *7 (E.D. Mo. Mar. 5, 2021) (citing *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). Damage to reputation, loss of consumer goodwill, and the threat of

unrecoverable economic loss and customers can all constitute irreparable harm. *Kroupa v. Nielsen*, 731 F.3d 813, 820 (8th Cir. 2013); *Ronnoco Coffee*, 2021 WL 842599, at *10. Where one party is likely to repeatedly breach a multi-year contract, an injunction is appropriate. *See Home Shopping Club, Inc. v. Roberts Broadcasting Co.*, 989 S.W.2d 174, 181 (Mo. Ct. App. 1998).

Here, Niman Ranch contends that Missouri Prime's failure to provide the required notice period before termination, refusal to receive Niman Ranch's cattle, and failure to perform its obligations for the required term means that Niman Ranch's cattle will not be processed into finished meat products until it can get a replacement processor many weeks from today. Accordingly, it argues that Niman Ranch will be unable to fulfill its obligations to provide the finished meat products to its customers, thereby causing significant harm to Niman Ranch's reputation and ruining its goodwill. *See also United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."); *900 Broadway v. Altosgroups*, 2020 WL 12675571, at *5 (W.D. Mo. Sept. 11, 2020) ("Monetary damages are inadequate to compensate Plaintiffs for loss of goodwill, impacts to agreements with other entities, and impacts to other projects….").

Federal courts frequently enter TROs and preliminary injunctions requiring continued performance of supply contracts where harm to reputation, goodwill, and customer relations are concerned. *See, e.g., Garco Wine Co. v. Constellation Brands, Inc.*, No. 4:13-cv-00661-ERW, 2013 WL 5433480, at *1 (E.D. Mo. Sept. 27, 2013) (discussing TRO entry after termination of supplier-distributor relationship without 90 days' notice required by Missouri franchise law); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990) (reversing district court, entering preliminary injunction, and observing irreparable harm often consists of lost customers and competitive disadvantage from distributor's inability to supply customers with terminated

product."); *BorgWarnerPDS (Anderson), L.L.C. v. Indus. Molding Corp.*, 2020 U.S. Dist. LEXIS 41937, at *17-18 (E.D. Mich. Mar. 11, 2020) (granting TRO requiring continued supply of parts, and emphasizing irreparable harm to plaintiff's goodwill, including, incalculable losses from shut out of future supply, and severe damage to reputation as reliable, on-time supplier, leading to lost goodwill and future business); *Pacesetter, Inc. v. Aortech Int'l PLC*, 2012 WL 12894007, at *4 (C.D. Cal. Nov. 1, 2012) (granting TRO requiring continued performance, finding irreparable harm because plaintiff's remedial measures drastically reduced or eliminated if agreement terminated, and finding termination would affect plaintiff's goodwill and reputation); *Trw Auto. United States LLC v. Webco Indus.*, 2009 U.S. Dist. LEXIS 145477, at *7-8 (E.D. Mich. Jan. 16, 2009) (granting TRO requiring continued delivery of parts and finding irreparable harm because of lost customer relations and goodwill).

Furthermore, the delay in processing will harm Niman's ranchers as well, because Niman will not be able to take its ranchers' cattle, at cost to the rancher. If the cattle remain unprocessed for too long, it cannot be used for grassfed programs and ranchers may switch to grain-fed programs. Accordingly, Niman is at risk of losing some of its suppliers as well as customers.

The Court is satisfied that, absent injunctive relief, Niman Ranch may suffer irreparable harms to its goodwill, reputation, and to agreements with other entities. Government regulations and requirements, among other hurdles, make it impossible for Niman Ranch to replace Missouri Prime's processing obligations in a shorter time frame than the required contractual notice period. Injunctive relief as pleaded for in Niman Ranch's Application for Temporary Restraining Order and Preliminary Injunction is appropriate to prevent irreparable harm to Niman Ranch.

### 3. The balance of the equities favors Niman Ranch

The balance of equities analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and other interested parties, including the public. *Dataphase*, 640 F.2d at 113. In doing so, courts consider the threat to each of the parties' rights that would result from granting or denying the injunction, the potential economic harm to the parties, and interested third parties, and whether the defendant has already taken remedial action. *Noodles Development, LP v. Ninth Street Partners*, LLP, 507 F. Supp. 2d 1030, 1038-39 (E.D. Mo. 2007).

The balance of the equities favors Niman Ranch. As explained above, Niman Ranch faces irreparable harm in the absence of a TRO. On the other hand, the requested TRO only requires Missouri Prime to abide by the terms of the Agreement that it voluntarily entered, and only for 90 days after issuing a proper notice of termination as required by the Agreement. Missouri Prime thus faces no "legal harm" if the Court enters a TRO. *See Zorn v. K.C. Community Constr. Co.*, 812 F. Supp. 948, 952 (W.D. Mo. 1992) (granting preliminary injunction and stating "[T]he only 'harm' to the defendant is a requirement that it abide by the terms of the agreement it has made. The defendant does not suffer legal harm by this Court's ruling …."); *see also 900 Broadway*, 2020 WL 12675571, at *6 (holding that the defendant "entered into a contract and failed to perform its obligations, such that" injunctive relief "cannot constitute significant hardship"); *H&R Block Tax Services LLC v. Murphy*, 2013 WL 12129645, at *5 (W.D. Mo. Apr. 16, 2013) (granting preliminary injunction and finding balance of harms weighed in favor of plaintiff because defendant was required "only to conform with his contractual obligation"); *cf. Heck Implement, Inc. v. Deere & Co.*, 926 F. Supp. 138, 140 (W.D. Mo. 1996) (granting preliminary injunction enjoining supplier from terminating agricultural implement dealership and stating "In my judgment, likely harm to [the plaintiff] from loss of the dealership greatly outweighs any likely

harm to [the defendant] from continuing the dealership for a hypothetical six months."). The balance of the equities justifies injunctive relief in this case.

### 4. The public interest favors injunctive relief in this case

An injunction is in the public interests if the public interest would be served by injunctive relief. *See Community of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 613 F. Supp. 2d 1140, 1145 (W.D. Mo. 2009). The public interest favors both preserving the enforceability of contractual agreements. *900 Broadway*, 2020 WL 12675571, at *6 ("[I]t is in the public interest to enforce valid contracts."); *see also H&R Block Tax Servs.*, 2013 WL 12129645, at *5 ("Under Missouri law, the public interest favors 'preserving the ability of parties to freely enter contracts and to seek judicial enforcement' of such contracts."); *Pacesetter*, 2012 WL 12894007, at *5 (granting TRO requiring continued performance, stating "[t]he public has an interest in valid contracts being upheld"). And it favors maintaining the food-supply chain. *Rural Comm. Workers Alliance v. Smithfield Foods, Inc.*, 459 F. Supp. 3d 1228, 1245 (W.D. Mo. 2020) ("[T]he public has an interest in maintaining the food-supply chain and access to meat products …."); *see also State ex rel. Mo. Dep't of Agric. v. McHenry*, 687 S.W.2d 178, 182 (Mo. 1985) (recognizing the "public's interest in an abundant food supply").

Here, Niman Ranch seeks to enforce the basic terms of the Agreement and continue supplying food product to its customers. The public interest is thus best served by protecting Niman Ranch's contractual interests. Without a government certified processor to harvest, cut, trim, and package cattle into finished meat products, Niman Ranch's reputation and goodwill associated with timely providing finished meat products to its grocery stores and food distributor customers could be diminished and the food supply for the public may be interrupted.

## CONCLUSION

Wherefore, for the reasons set forth herein, the Court **GRANTS** Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunctive Relief.

It is hereby **ORDERED** that upon receipt of the bond in the amount of **$5,000** the Court enters the following Temporary Restraining Order and Preliminary Injunction:

- Defendant Missouri Prime is prohibited from engaging in activities in violation of the Agreement, namely refusing to process cattle sent to Defendant Missouri Prime by Niman Ranch in accordance with the terms of the Agreement. Defendant Missouri Prime is ordered to process cattle supplied by Niman Ranch as follows:
    - Missouri Prime must adhere to the Agreement and process cattle supplied by Niman Ranch for a 90-day period, commencing upon receipt of the above-mentioned bond.
    - Missouri Prime must process 80 head of cattle supplied by Niman Ranch the first week and must process 40 head of cattle per week for the remaining duration of the period.
    - The parties may, by mutual agreement in writing, alter or amend either party's obligations under the Agreement during the 90-day period.

**IT IS SO ORDERED.**
DATED: January 20, 2022

                                                    */s/ Douglas Harpool*
                                                  **DOUGLAS HARPOOL**
                                                  **UNITED STATES DISTRICT JUDGE**